Evans HOBSON, Appellant,

v.

UNITED STATES of America,
Appellee.

No. 15365.

United States Court of Appeals
Eighth Circuit.

Nov. 15, 1955.

Solbert M. Wasserstrom, Kansas City, Mo. (Francis L. Roach, Kansas City, Mo., was with him on the brief), for appellant.

Paul R. Shy, Asst. U. S. Atty., Kansas City, Mo. (Edward L. Scheufler, U. S. Atty., Kansas City, Mo., was with him on the brief), for appellee.

Before JOHNSEN, COLLET, and VAN OOSTERHOUT, Circuit Judges.

VAN OOSTERHOUT, Circuit Judge.

The appellant, Evans Hobson, hereinafter referred to as defendant, appeals from final judgment of conviction upon an indictment charging that he did willfully conceal and possess a narcotic drug, to-wit, heroin, in violation of 21 U.S.C. § 174. The case was tried to the court, the defendant having waived a jury trial. Before the trial and again at the trial the defendant moved to suppress as evidence heroin which the defendant claimed was obtained by means of an unlawful search and seizure. The defendant at the close of the Government's evidence and again at the close of all of the evidence moved for a judgment of acquittal "for the reason that the only evidence presented against him was the result of an unreasonable search and seizure and should therefore be suppressed." All motions to suppress and for acquittal were overruled.

The defendant contends that the Government agents obtained the heroin upon which his conviction was based by means of an unlawful search and seizure, and that the court erred in overruling his motion to suppress this evidence. We look to the evidence bearing on this issue.

Defendant's wife, Regina, had been under surveillance by the Federal Bureau of Narcotics for a number of years. Agent Heisig testified that as a result of personal observation he knew Regina had participated in an illegal sale of narcotics on March 22, 1955. No action was taken upon this information acquired by Agent Heisig until April 20, 1955. On the latter date Heisig enlisted the aid of Kansas City police officers Heinen and Henthorne, and went to the residence of Regina for the stated purpose of arresting her for the March 22 offense. He was also looking for Gee, another suspect, whom he thought might be at Regina's home. The officers had no warrant of arrest or search warrant. No plausible reason is given why a proper warrant had not been obtained. The officers cruised about the streets for some time before going to the defendant's home. The defendant, Regina, and Regina's parents resided at 2314 Monroe Street in Kansas City, Missouri, in a home owned by Regina's mother. Defendant had lived there about a year, had the full use of the house, and paid rent by sharing the bills. Upon arrival at this house, pursuant to their established custom and at the direction of the other officers, Henthorne went to the back of the house and took a position inside the fence enclosing the back yard. Agent Heisig testified that Henthorne's function in the back yard was "to apprehend anyone who might try to get out, to recover any evidence that might be thrown from the rear of the premises, and generally an observation post." Heisig and Heinen went to the front door and knocked. Defendant appeared at the door but retreated without opening it. Shortly thereafter Regina appeared at the door clad only in a slip. The officers identified themselves and demanded admittance. Regina asked for time to get into some clothes. About that time the officer in the rear shouted, "He threw some 'stuff' out of the window." The officers at the front door then made a forced entrance into the house by breaking the glass in the outer door and forcing open the inner door. The defendant threw a package from a back window into the enclosed back yard. He claims that he did this immediately after the break-in. The officers contend the break-in fol-

lowed the throwing and the shouted information that the "stuff" had been thrown. This contention of the officers is inconsistent with their contention that the prime purpose of their visit was to arrest Regina, and would at least tend to show that the real motive for the break-in was to follow up the throwing out of the package. Heisig admitted that when they broke in he had no information as to the contents of the package. The defendant violated no law merely in throwing a package out of the window into his own back yard.

The court at the conclusion of the trial stated:

"You gentlemen knew of the violation of the law by Regina Hobson for some thirty days. You should not have gone to those premises for the purpose of arresting her without a warrant of arrest, your sole purpose being, as you have all testified, to go there to arrest Regina Hobson. You were on the premises at 2314 Monroe illegally and you violated the Constitution and you committed an offense when you broke in that front door under the circumstances of this case.

\*      \*      \*      \*      \*      \*

"Now, that is the danger of violating the Constitution and there is no rhyme nor reason for federal officers violating the Constitution of the United States, and when you are with members of the Kansas City police department you are responsible for whatever they do in so far as a federal offense is concerned. Had you gentlemen found these narcotics inside of that house under the circumstances, there wouldn't be any question but what this Court would have to declare that you were guilty of an unlawful search and seizure."

Upon the question of the right to arrest Regina without a warrant about a month after the alleged offense, the Government's brief in response to a statement that Regina was acquitted states:

"\* \* \* This, of course, is not indicative of any knowledge Agent Heisig might have had but, since counsel has raised the question, this court should be advised that Regina Hobson admitted that she purchased heroin at the request of a narcotics agent from one Vernon Gee and was acquitted only because the court found that she was merely a conduit or agent for the buyer and could not be found guilty as a 'seller.' \* \* \*"

There is considerable doubt whether probable cause existed at this late date for Regina's arrest without a warrant under all the facts and circumstances disclosed by the record. There is also considerable doubt whether the officers' purpose in visiting defendant's home was to arrest Regina.

As far as the defendant is concerned, there clearly was insufficient evidence to justify his arrest at the time of the break-in. As previously stated, the break-in occurred before the officers had knowledge of the contents of the package. At the time of the break-in Regina was downstairs near the door. The defendant was upstairs. There is no justification in this record for a search of the entire house including the upstairs even if it be assumed that the arrest of Regina was legal. In Brock v. United States, 5 Cir., 223 F.2d 681, at pages 684–685, the court states:

"Before undertaking an analysis of appellant's rights under the Fourth and Fifth Amendments, in order to put the matter in proper perspective, it may be well to refer again to the basic principles which underlie these rights. First of all, the right to protection against unreasonable search or seizures and compulsory self-incrimination belongs to the guilty as well as the innocent. McDonald v. United States, 335 U.S. 451, 69 S. Ct. 191, 93 L.Ed. 153. Unless courts are prepared to enforce these rights and protect those charged with crime, irrespective of their obvious guilt, they condone illegitimate and unconstitutional practices which, if long adhered to, may re-

sult in a breakdown of the protection accorded free men by the Fourth and Fifth Amendments. This course, like the enforcement of other parts of the Bill of Rights, may often afford a shelter for criminals, 'But the forefathers thought this was not too great a price to pay for that decent privacy of home, papers and effects which is indispensable to individual dignity and self respect. They may have overvalued privacy, but I am not disposed to set their command at naught.'

"It must be remembered that the Bill of Rights, of which the Fourth and Fifth Amendments are a part, was incorporated in the Constitution in an effort to give the courts of this country the authority, in James Madison's immortal phrase, 'to oblige the government to control itself.' Concentrations of power, however benign in inception, historically have led to despotism, and compulsory self-incrimination through the unreasonable search of a man's home is the act of a despot. ' " * * * it is abhorrent to the instincts of an American. It may suit the purposes of despotic power; but it cannot abide the pure atmosphere of political liberty and personal freedom." ' * * * "

In United States v. Jeffers, 342 U.S. 48, at page 51, 72 S.Ct. 93, at page 95, 96 L.Ed. 59, the Supreme Court says:

"The Fourth Amendment prohibits both unreasonable searches and unreasonable seizures, and its protection extends to both 'houses' and 'effects.' Over and again this Court has emphasized that the mandate of the Amendment requires adherence to judicial processes. See Weeks v. United States, 1914, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652; Agnello v. United States, 1925, 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145. Only where incident to a valid arrest, United States v. Rabinowitz, 1950, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653, or in 'exceptional circumstances,' Johnson v. United States, 1948, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436, may an exemption lie, and then the burden is on those seeking the exemption to show the need for it. McDonald v.

United States, 1948, 335 U.S. 451, 456, 69 S.Ct. 191, 93 L.Ed. 153. In so doing the Amendment does not place an unduly oppressive weight on law enforcement officers but merely interposes an orderly procedure under the aegis of judicial impartiality that is necessary to attain the beneficent purposes intended. Johnson v. United States, supra. Officers instead of obeying this mandate have too often, as shown by the numerous cases in this Court, taken matters into their own hands and invaded the security of the people against unreasonable search and seizure."

In Trupiano v. United States, 334 U.S. 699, 68 S.Ct. 1229, 92 L.Ed. 1663, the Court held that search warrants must be procured when practicable in the case of a search incident to arrest. This rule was modified in United States v. Rabinowitz, 339 U.S. 56, at page 66, 70 S.Ct. 430, at page 435, 94 L.Ed. 653, where the Court prescribes the following test:

"The relevant test is not whether it is reasonable to procure a search warrant, but whether the search was reasonable. The criterion in turn depends upon the facts and circumstances—the total atmosphere of the case. It is a sufficient precaution that law officers must justify their conduct before courts which have always been, and must be, jealous of the individual's right of privacy within the broad sweep of the Fourth Amendment."

In our present case we do not believe that the Government has demonstrated that the search here made was reasonable. The finding of the trial court that the search violated defendant's rights under the Fourth Amendment is fully supported by the record.

The Government places its chief reliance upon its contention that the heroin was obtained by voluntary disclosure of the defendant and not as the result of search and seizure. The evidence discloses that while the officers were seeking to gain admission and either immediately before or just after the break-in the defendant threw the heroin

out of the window into the enclosed back yard. As to this the trial court says:

"Well, I am afraid that when the defendant did that, whatever constitutional rights he had, he threw out the window with them, because that was a voluntary disclosure on his part of the possession of contraband, and officers of the law, like others, do not need to shut their eyes and look the other way when they see an offense being committed, and I think when the defendant did that act he came right within the holding of Brinegar v. United States [338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879] * * *."

The facts in the Brinegar case are clearly distinguishable from those confronting us here. There, Brinegar was illegally transporting liquor into Oklahoma, a dry State, in his automobile. When he was stopped upon the highway the officers could see some liquor in his car. In response to a question as to how much liquor he had in his car, he said, "Not too much." The officers had previous knowledge that the defendant had frequently loaded large quantities of liquor in his car. They knew his car and were aware of the fact that he was traveling into a dry State from a known source of supply. Brinegar was on a public highway in a moving vehicle. Three of the justices dissented in the Brinegar case on the basis that there was insufficient showing of probable cause to justify the search.

In our present case the search was made of a home. In Johnson v. United States, 333 U.S. 10, at page 15, 68 S.Ct. 367, at page 369, 92 L.Ed. 436, where entrance into a hotel room without a warrant was held to violate defendant's constitutional rights, the Court, placing some emphasis on the fact that a home was invaded, said:

" * * * No reason is offered for not obtaining a search warrant except the inconvenience to the officers and some slight delay necessary to prepare papers and present the evidence to a magistrate. These are never very convincing reasons and, in these circumstances, certainly are not enough to by-pass the constitutional requirement. No suspect was fleeing or likely to take flight. The search was of permanent premises, not of a movable vehicle. * * *"

It seems clear from a consideration of the cases that protection against search and seizure in private homes is most carefully guarded.

The enclosed back yard in which the thrown package landed was part of the curtilage of the defendant's home and was subject to the same protection as the home itself. Kroska v. United States, 8 Cir., 51 F.2d 330, 333; Brock v. United States, supra. The situation here is distinguishable from such cases as Ellison v. United States, 93 U.S.App.D.C. 1, 206 F.2d 476, relied upon by the Government. In that case the evidence was in open view and was discovered by officers approaching the door to defendant's home for the purpose of making a legitimate inquiry.

Considering the total atmosphere of the case as directed by United States v. Rabinowitz, supra, we can not separate the throwing of the package from the unlawful search. The defendant's action in throwing the package was not voluntary but was forced by the actions of the officers. That the officers anticipated such a result is evidenced by the fact that they stationed a man in the back yard to receive any person or evidence that might come out. The throwing of the package was directly caused by the actions of the officers. Further, even after the package was thrown out it remained upon protected premises. Without its seizure and examination it afforded no incriminating evidence.

■ The Government further contends that the defendant is not in a position to suppress the seized evidence because he disclaimed ownership therein. However, the evidence was obtained from defendant's home as the result of a search thereof. This was sufficient to give the defendant proper standing to move for the suppression of the seized evidence. United States v. Jeffers, supra; Cofer v. United States, 5 Cir., 37 F.2d 677; Mat-

thews v. Correa, 2 Cir., 135 F.2d 534; Washington v. United States, 92 U.S. App.D.C. 31, 202 F.2d 214; United States v. Blok, 88 U.S.App.D.C. 326, 188 F.2d 1019; 79 C.J.S., Searches and Seizures, § 52.

█ The court committed prejudicial error in overruling defendant's motion to suppress the seized evidence. In its opinion the court makes it clear that the conviction of defendant is based upon consideration of the evidence seized by the officers. We have hereinabove held that such evidence should be suppressed.

Reversed and remanded to the District Court.